**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>                     Plaintiff,<br>vs.<br><br>RANDY MILLER<br><br>                     Defendant. | Case No. 25 CR 138-01 (LAK)<br><br>Judge Lewis A. Kaplan |

**DEFENDANT RANDY MILLER'S**
**<u>SENTENCING MEMORANDUM</u>**

<u>**TABLE OF CONTENTS**</u>

**I. Factual Background** ................................................................................................................. **2**

    A.  Introduction .................................................................................................................. 2
    B.  Beginning of the Project .............................................................................................. 3
    C.  Introduction to Ziegler ................................................................................................ 3
    D.  Hiring of Oak View Group .......................................................................................... 6
    E.  Financing and Construction ......................................................................................... 7
    F.  Legacy Park Opening and OVG Failures .................................................................... 8
    G.  Alternative Financing and Bankruptcy ..................................................................... 10

**II. Procedural History, the Plea Agreement, and the PSR** .................................................. **11**

**III. Mr. Miller's Personal Background and Characteristics** ............................................... **12**

**IV. A Sentence of Two Years Is Sufficient, But Not Greater Than Necessary** ................... **16**

    A.  Legal Standard .......................................................................................................... 16
    B.  The Circumstances of Mr. Miller's Non-Violent Offense ......................................... 17

        i.     Adequacy of Risk Disclosures and Non-Binding Nature of Letters of Intent .. 17
        ii.    The Loss Amount Overstates Mr. Miller's Culpability ..................................... 18
        iii.   Mr. Miller Promptly Repaid Bond Proceed Funds that He Used ..................... 20

    C.  Mr. Miller Timely Accepted Responsibility for His Conduct and Has Cooperated with
        Authorities ................................................................................................................ 21
    D.  Mr. Miller's Severe Medical Issues Support a Two-Year Sentence........................... 22
    E.  Mr. Miller is Supported by a Strong Community ....................................................... 24
    F.  A Two-Year Sentence Adequately Reflects the Seriousness of the Offense and
        Promotes Deterrence ................................................................................................. 25
    G.  The Mandatory Minimum Sentence is Appropriate ................................................... 26

**V. Self-Surrender is Appropriate, Which the Government Consents To** ............................. **26**

**VI. Bureau of Prisons Designation** ...................................................................................... **28**

**VII. Conclusion** ..................................................................................................................... **28**

Defendant Randy Miller, by and through undersigned counsel, respectfully submits his Sentencing Memorandum to the Court. After considering the sentencing factors contained in 18 U.S.C. § 3553(a), Mr. Miller respectfully requests that the Court sentence him to a term of imprisonment not to exceed two years. This sentence is sufficient, but not greater than necessary, to comply with the purposes of Section 3553(a). Mr. Miller also respectfully requests that he be permitted to self-surrender to the designated Bureau of Prisons ("BOP") facility after his sentencing and that the Court provide a judicial recommendation that he be designated to the minimum security satellite camp located at USP Tucson.

Mr. Miller comes before the Court for sentencing a humbled man. He fully recognizes and acknowledges that he committed a serious financial crime. And he is truly sorry for his actions, as reflected by the fact that, when informed by law enforcement that he was the target of this securities fraud investigation, he worked with counsel to engage with the Government, admit his wrongdoing, and negotiate a streamlined resolution through the filing of a criminal information and the entry of a negotiated plea agreement. But unlike many defendants in similar situations, Mr. Miller has not just verbalized his contrition – he has personally taken significant steps to take responsibility for his actions. Specifically, in advance of his upcoming sentencing hearing, Mr. Miller has agreed to an order of forfeiture of over $7 million and consented to a U.S. Securities and Exchange Commission ("SEC") enforcement action admitting liability and agreeing to refrain from purchasing or selling securities in the future, amongst other restrictions. His efforts to make right of his wrongdoing speak to his acceptance of responsibility for his conduct and his commitment to moving forward in his life as a law-abiding citizen. These actions, together with Mr. Miller's personal circumstances, particularly his advanced age and significant medical

conditions, all counsel strongly in favor of the Court sentencing him to a term of no more than two years, as any sentence longer than two years will put his life in serious jeopardy.

I.    **Factual Background**

    **A. Introduction**

Randy Miller's professional dream was to build a sports complex that was best in class. He had a vision of a one-stop location where families and communities from all around the country would come together to play sports and engage in recreational activities. There was no ulterior motive, no plan to defraud anyone, and nothing sinister afoot. His dream was to build a world-class, all-encompassing youth and adult sports complex that would serve families, athletes, and the community for generations.

Unfortunately, this dream has become a nightmare for him and his family. Mr. Miller's efforts to turn his dream into reality have destroyed his life and hurt those whom he loves the most. It has destroyed his finances, his credibility, and, worst of all, the family whom he loves dearly and unconditionally. Mr. Miller accepts responsibility and understands that he must now go to prison. He wants to use this time to pay his debt to society and plan how he is going to be a positive force for his family and community during the remainder of his natural life.

However, we believe, for the reasons discussed herein, the Presentence Investigation Report ("PSR") and Sentencing Guidelines calculation overstate the culpability of Mr. Miller. Both Randy and Chad Miller wanted this project to succeed and they worked extraordinarily hard to achieve that goal. Indeed, as we will explain in further detail, this project ultimately failed for reasons unrelated to any fraud. This is not a case about a scam. This is a case about a father and son chasing their dream and unfortunately making some really bad decisions along the way. For the reasons discussed herein, we respectfully urge this Court to impose a sentence of two years

incarceration, which is sufficient but not greater than necessary, in light of the nature of the offense conduct, Mr. Miller's acceptance of responsibility, and his age and medical condition.

### B. The Beginning of the Project

Mr. Miller spent decades of his professional life attempting to create a sports park where families from across the country could come to compete in sports and participate in healthy, recreational activities. The idea – Legacy Park (or the "Park") – came from his own experience as a supportive father during which he spent countless hours with his sons at their baseball, basketball, and football games and tournaments.

Mr. Miller focused much of his efforts on searching for a suitable site and collecting letters of intent ("LOI"), while also pursuing financing for Legacy Park through several unsuccessful attempts. Those failures underscored the need for an experienced financier.

### C. Introduction to Ziegler

Sometime between August and October 2019, Legacy Sports, the business entity behind Legacy Park, was introduced to Ziegler through a third party. Ziegler is a specialty investment bank that focuses on municipal finance and structured finance; its work is concentrated in sectors that rely heavily on long-term capital projects and bond financing.

Legacy Sports recognized that only an experienced underwriter with access to institutional investors could transform Mr. Miller's vision into a viable financing package and they relied on Ziegler's expertise to identify the optimal financing structure for the Park. Ultimately, Ziegler recommended municipal bonds as the best source of financing for the Park, but informed Legacy Sports that it could not serve as the bond issuer. Instead, Ziegler proposed the use of a not-for-profit borrower and a decision was made to appoint Legacy Cares as the issuer of the municipal bond offering.

In January 2020, Legacy Sports executed its official engagement with Ziegler, moving the Legacy Park project beyond the mere planning stages. Ziegler informed Legacy Sports that a municipal bond offering required, among other things, a Limited Offering Memorandum ("LOM"). Ziegler took the lead in drafting the LOM and coordinating with Legacy Sports, sports organizations, and potential investors. Ziegler also hired Johnson Consulting to conduct a peer review of an older feasibility study of the concept (which was based on a different location than Legacy Park).

In January 2020, Ziegler was fully managing and guiding Legacy Sports in connection with the municipal bond offering. Ziegler began drafting the LOM using the previously provided LOIs and an outdated third-party feasibility study provided by Sports Facilities Advisors ("SFA"). During this process, Ziegler told Legacy Sports that the existing LOIs (many of them outdated and vague) were inadequate to show clear and measurable interest in Legacy Park. Specifically, Ziegler requested more robust LOIs that spelled out specific details such as the number of teams or participants, the duration and frequency of events, projected attendance, and estimated financial commitments. Ziegler insisted that without these details, investors would not view the LOIs as credible evidence of demand, and directed Legacy Sports to provide this information immediately.

At this time, Randy and Chad Miller, and others, intent on securing financing for the Park, recognized that reissuing dozens of LOIs would take months and delay the bond process, so they discussed their options amongst their executive team. They especially relied on Jeff De Laveaga, whose long-standing relationships with local and national sports organizations, combined with his extensive knowledge of operating sports leagues and events, positioned him as the best person at Legacy Sports to address Ziegler's demands. On information, Jeff De Laveaga suggested to Legacy Sports that they did not need to obtain entirely new LOIs for every organization. Many of

the organizations were long-term sports contacts of Jeff De Laveaga, and others, and their authorization would be unnecessary given this history.

Ziegler continued to insist that Legacy Sports provide the revised LOIs immediately to keep the financing on track. Randy and Chad Miller, desperate not to lose their best opportunity to secure financing after decades of failed financing attempts, began revising and amending the remaining LOIs. Randy and Chad Miller wrongfully justified the amendments to these documents because they already possessed the LOIs and believed the organizations remained committed to the Park project. It was also clear to Legacy Sports that these LOIs were potentially unenforceable documents, a point that was ultimately disclosed in the LOM.

By early 2020, Legacy Sports managed to produce the amended LOIs that Ziegler requested in connection with the LOM. In April 2020, Ziegler now requested that Legacy Sports assign those LOIs to Legacy Cares, the nonprofit conduit borrower of the bond proceeds. With financing in the balance, and in the middle of the COVID-19 pandemic when they could not easily revisit every sports organization, Mr. Miller, Jeff De Laveaga, Chad Miller, and others, transposed the existing LOI signatures onto the corresponding assignment forms and submitted them to Ziegler. Mr. Miller again rationalized his misconduct by holding the belief that these organizations, who had already expressed interest in Legacy Sports, were committed to the Park, and that Legacy Sports could not afford to miss their best opportunity at securing financing.

As part of its underwriting due diligence, Ziegler required Legacy Sports to prepare detailed financial pro formas for inclusion in the LOM. These pro formas served as financial projections, showing anticipated revenues from tournaments, league play, and other events, and were meant to demonstrate to investors that Legacy Park could generate sufficient income to service the bonds. As described below, Oak View Group ("OVG") separately provided projected

revenue figures for its assigned operational categories (representing almost 60% of the overall Park revenue) and park operating expenses. OVG Operating Agreement (Ex. B at 23–25). This included sponsorships, ticketing, concessions, food and beverage, special events, parking and merchandise which were incorporated into the overall financial model.

Mr. Miller was not in the weeds in developing the financial projections and relied upon others at Legacy Sports. Each tab listed organizations, dates, and projected attendance, which neither Randy or Chad Miller independently validated, but were based on limited research and historical data obtained from other similar sports complex projects. Randy and Chad Miller deferred to other Legacy Sports' executives, who confirmed to them that these practices were acceptable given the existing relationships between Legacy Sports and the several sports organizations. PSR ¶¶ 27–30. By August 2020, Ziegler finalized and issued the LOM. It included the revised LOIs, the pro formas, and excerpts from the 2016 SFA feasibility study.

### D. Hiring of Oak View Group

Ziegler required Legacy to secure OVG as a partner. Bryant Barber Email (Ex. C at 1, 3). OVG's reputation in sports management carried significant weight with investors, and Ziegler emphasized that OVG's involvement was essential to completing the bond offering specifically because the Millers lacked prior experience in operating a sports complex of this magnitude. *Id.* Under the agreement, OVG assumed responsibility for a majority of the Park's revenue categories, including sponsorships, ticketing, concessions, food and beverage, special events, parking and merchandise. OVG Operating Agreement (Ex. B at 23–25). Those categories accounted for roughly two-thirds of the $96.3 million in projected revenues. Legacy Sports, by contrast, per the LOM, limited their projected revenues to only those related to sports programming. OVG also

pledged to invest $10 million directly into the Park and its commitments formed a cornerstone of the financing structure for Legacy Park. Ziegler Investor Update (Ex. D at 6, 8).

### E. Financing and Construction

On August 19, 2020, Legacy Sports secured financing and bond proceeds began to be released for construction and other operational expenses. Construction funds went into a Legacy Cares-controlled bank account, and Legacy Sports began receiving a monthly allowance for pre-opening costs. Everyone understood that the first bond payment was due in September 2022, which left less than two years to complete construction, open the Park, and generate enough revenue to cover the bond payments.

Waltz Construction, a local general contractor, guaranteed to build Legacy Park for $180 million and committed to advancing the upfront costs for permitting, easements, zoning, architectural work, civil engineering, and subcontractors – expenses that Legacy Sports had no ability to cover on its own. Waltz Construction was selected specifically because it offered to shoulder those costs. Legacy Sports was told the Park construction would proceed under a single-phase Guaranteed Maximum Price ("GMP"). This meant that the entire Park would be built in one continuous phase, with a fixed maximum price that Waltz Construction could not exceed. For Legacy Sports and potential investors, a single-phase GMP carried enormous significance: it signaled cost certainty, reduced risk of ballooning expenses, and ensured that every major revenue-generating component of the Park would open together and on time.

On September 20, 2020, Legacy Park broke ground and almost immediately, new issues surfaced. Legacy Sports discovered that (1) the Park construction costs had been mispriced by over $100 million; (2) although investors had been told the Park would be built under a single-phase GMP, Ziegler unilaterally changed the cost arrangements to a three-phase GMP just before closing,

without notifying investors; and (3) the initial contractor, on information, submitted fraudulent invoices and ran over budget, all of which contributed to roughly $40 million in mechanic's liens. Legacy Sports promptly notified Legacy Cares, the construction monitor, and Ziegler about these issues.

### F.  Legacy Park Opening and OVG Failures

In January 2022, Legacy Park opened but construction remained incomplete; the performance training facility, Fieldhouse C, and critical infrastructure were still awaiting construction, while the e-sports arena and twelve soccer fields were never built. These facilities had been projected to serve as major revenue generators. COVID-19's lingering financial effects further suppressed turnout, leaving the Park without the early revenue surge it needed.

OVG was underperforming from day one. OVG never delivered the $10 million investment it had promised, nor did it provide the operational support it was contractually obliged to deliver. Ziegler Investor Update (Ex. D at 6, 8). OVG's anticipated support was central to investor confidence and Legacy Park's financial model. Bryant Barber Email (Ex. C at 1, 3). Although OVG initially hired 30 staff before the Park's opening, that limited hiring effort merely underscored its broader failure to live up to its obligations. While the sports side of the Park consistently brought in participants after it opened, it was severely understaffed. Further, OVG failed to develop or execute on critical revenue categories, including ticketing, concessions, food and beverage, special events, parking and merchandise.

Neither the $10 million investment from OVG, nor the promised $25 million operating line from Ziegler, ever materialized. Those funds were earmarked for essential expenses: land lease payments, utilities, employee payroll, insurance, and daily operating costs. Without these

operating lines, and while still managing construction delays and cost overruns, Legacy Sports faced a looming September 2022 bond payment with no reliable source of operating capital.

From 2022–2023, Legacy Park welcomed millions of visitors, ranking as one of Arizona's most-visited attractions. Placer.AI Report (Ex. E). Despite exceeding attendance expectations and generating between $18–$21 million in sports operations and $5 million in sports sponsorships (roughly 40 percent of the projected $41 million in sports-side revenue), Legacy Sports could not overcome OVG's failure to perform essential Park operations. *See* Jon Willis Ltr. (Ex. A). In total, Legacy Sports generated approximately $31–33 million in year one, while OVG (responsible for two-thirds of the Park's projected $96.3 million in annual revenue) delivered only $7–8 million, about 10 percent of its target.

The Park's revenue, hamstrung by OVG's operational failures, quickly collapsed into crisis. Subcontractors filed mechanic's liens for unpaid bills, and Legacy Sports did not have the funding to meet payroll. The Millers were often scrambling to simply keep the Park afloat. They deferred management and accounting fees and cut their own salary to ensure employees were paid for their work at the Park. When payroll came due, the Millers personally covered weeks of employee salaries. These actions, and those by Legacy Sports, underscored Mr. Miller's belief in the Park's viability, even as the project stood on the brink of default.

As a volunteer consultant to the project aptly explained:

While Randy worked to see that vision come to life, the project faced a multitude of significant and, in many cases, uncontrollable challenges. The financing structure itself placed the project under immediate pressure with no meaningful stabilization period to allow for proper operational ramp-up. Additionally, the unforeseen impact of COVID-19 and supply chain disruptions delayed the park's opening, compounding financial difficulties from the start. Operational issues further exacerbated the situation, including Oak View Group's complete failure to fulfill its obligations related to concerts, live events, and food and beverage operations—critical revenue streams that were expected to underpin the park's financial model.

> From my professional perspective, Randy Miller is a good man who ultimately made some poor decisions. However, it is important to recognize that many of those decisions were made in the context of trying to overcome a series of structural and external obstacles that created an almost unwinnable situation. While there were errors in leadership, it is equally clear that Randy was committed to realizing a project he believed would serve the broader community and his own family's future.

Jon Willis Ltr. (Ex. A).

Likewise, bond counsel, Timothy Stratton, Esq., explained:

> Unfortunately for all involved, Randy's project suffered terrible timing with what we all experienced with the onslaught of COVID. Although we didn't know it at the time, these COVID related complications and their lingering aftermath crippled an otherwise sound business plan, and unknowingly set the stage for the unfortunate financial events that would unfold many months after the last bonds were sold.

> Although, upon examining the record, there were mistakes made, the proximate cause of damage was not the conduct of Legacy Sports or Randy Miller. Other aspects of the business operations, not controlled by Legacy, contributed to its failure to meet financial projections in no small way. I witnessed Randy Miller working diligently to attempt to save the business and make the enterprise a financial success.

Timothy Stratton, Esq. Ltr. (Ex. F).

### G.  Alternative Financing and Bankruptcy

In mid-2022, facing mounting debt and the inability to meet financial obligations, Legacy Sports began seeking alternative financing. The Millers, seeking to avoid default and/or bankruptcy, pivoted and sought refinancing through Loop Capital. Loop Capital Engagement Ltr. (Ex. G). On September 22, 2022, Legacy Sports formally retained Loop Capital to serve as its "strategic advisor to provide investment banking services in connection with the Company's capital raising needs as it considers restructuring its current debt obligations." *Id.* at 1. The sports side of the Park continued to trend upward and Loop Capital expressed confidence in the project. Legacy Sports facilitated an agreement with Loop Capital in which Loop Capital offered to inject

its own equity while covering the $40 million in mechanic's liens that crippled operations. Loop Capital's refinancing proposal would have absorbed the liens, restored construction progress, and restructured up to half of the bond amount.

However, trustee counsel refused to consider the Loop Capital refinancing. Consequently, Legacy Sports missed its first bond payment and defaulted on the municipal financing. Bankruptcy soon followed and the Park ultimately sold for $25 million, with investors recovering $2 million and retaining a 20 percent equity stake.

Despite the bankruptcy, the park is still operating, now under the name Arizona Athletic Grounds, and is a major sports attraction. *See* Arizona Athletic Grounds, at https://azgrounds.com; Visit Mesa, "Arizona Athletic Grounds," at https://www.visitmesa.com/things-to-do/spectator-sports/arizona-athletic-grounds; *see also* Grace Hodges Ltr. (Ex. H) ("I would also like to highlight that Legacy Sports Park has become an asset to the City of Mesa, thanks to the ongoing efforts of Randy and the entire Miller family.").

## II.    <u>Procedural History, the Plea Agreement, and the PSR</u>

On March 31, 2025, a sealed indictment was filed against Mr. Miller and his son, Chad Miller, alleging various securities and wire fraud offenses. Shortly thereafter, and pursuant to a negotiated plea agreement, the Government filed a Superseding Information on May 28, 2025, charging Mr. Miller with one count of Securities Fraud, in violation of 15 U.S.C. § 77q(a) and 77x and 18 U.S.C. § 2, one count of Wire Fraud, in violation of 18 U.S.C. § 1343, and one count of Aggravated Identity Theft, in violation of 18 U.S.C. §§ 1028A(a)(1), (b) and 2. On the same day, Mr. Miller appeared before the Court and entered a plea of guilty to Count One (Securities Fraud) and Count Three (Aggravated Identity Theft) of the Superseding Information. In the plea agreement, Mr. Miller agreed to forfeit $7,289,134.89, which represents the amount of proceeds

traceable to the commission of Count One of the Superseding Information. This matter is set for a sentencing hearing on September 9, 2025 before this Court.

Since his indictment, Mr. Miller has remained out of custody, at his home in Arizona. This Court ordered him released on a personal recognizance bond and he has remained in compliance with all of his pretrial conditions. Mr. Miller has spent the last several months working with the Government to resolve this case before trial and the SEC to resolve its enforcement action.[1] Judgment in *SEC v. Randall J. Miller*, 25-cv-02702-JGK, Dkt. 25 (S.D.N.Y.) (Ex. I).

### III.    Mr. Miller's Personal Background and Characteristics

Mr. Miller is a 70-year-old lifelong resident of the United States, born and raised in Pekin, Illinois, to a close-knit, middle-class family. Despite experiencing the challenges of his parents' separation at a young age, Mr. Miller maintained strong familial ties and was raised in a supportive environment by his mother, who worked as a nurse, and his stepfather, who worked in construction. He graduated from Tremont High School in 1973 and later moved to Arizona to pursue a career in sports management, sales, and marketing.

Mr. Miller's professional life reflects entrepreneurial initiative and a commitment to community engagement. Despite not having a college degree, early on his career, Mr. Miller secured a job working for a professional minor league baseball team, where he worked in the sales and marketing department. From there, he went on to build a business that sold cellphones and car phones throughout the late 1980s and 1990s. Mr. Miller's passion has always been connected to sports, and in 2014, Mr. Miller combined this passion with his skills in sales and marketing to start Legacy Sports LLC to develop a family sports entertainment and park complex.

---

[1] As of the filing of this sentencing memorandum, the PSR has not yet been finalized.

On a personal level, Mr. Miller is a devoted father and maintains strong relationships with his family, including his two adult sons, Chad, age 40, and Brett, age 37, as well as his four grandchildren. Although he is no longer married to the mother of his two sons, he maintains an amicable relationship with her and has strong ties to his friends and family in the Phoenix, Arizona area as demonstrated by the numerous letters of support attached to this memorandum. In fact, after Mr. Miller and Chad's mother became divorced, Chad lived with his father, not his mother.

Brett Miller, one of Mr. Miller's sons, writes about his father:

> Randy has consistently demonstrated love, reliability, compassion, honesty, and has always been someone I can turn to and look up to. He has been an entrepreneur at heart, with a passion for creating a sports and family entertainment park that he envisioned leaving as a legacy for his children, grandchildren, and future generations. His dream was to create something lasting for the community to enjoy for years to come. . . . He is a deeply faith-driven individual, following the teachings of Joel Osteen and attending weekly service at local church. After each service, he calls me to share insights and lessons he has learned, hoping to apply them in his own life and positively influence others. As a grandfather of four, Randy's love for his grandchildren is immeasurable, and the feeling is mutual. He shows them unconditional love, always putting family first. . . . Randy is always honest about his mistakes and takes responsibility for his action, but I am certain he would never intentionally harm anyone for personal gain.

Brett Miller Ltr. (Ex. J).

Mr. Miller's friends describe him in similar terms. For example:

> Randy is a man of faith with a heart of gold. I have had the pleasure of spending time with him and his family on occasion, and I can say without hesitation that he is a person of integrity who genuinely wants the best for everyone around him. His character is defined by honesty, kindness, and a deep-rooted sense of responsibility toward others.

Amy Pradetto-Werden Ltr. (Ex. K).

> Several examples of his generosity and kindness were exhibited by repeated referrals of clients to my medical practice when they were ill. He not only connected the clients with me, he also covered their medical bills to ensure that they were able to receive all the needed care to become well again. There was no worry or questions about the cost of the services. He also wanted no mention of who covered

13

the bills, simply process the fees so they would get the help needed and not stress over the bill for service.

Lauren Beardsley, NMD Ltr. (Ex. L).

> Randy is, in short, a good person. From the time I met him he wanted to create a facility where families could come together for a variety of activities. I was so proud of him when he accomplished his lifelong dream. When I visited him at the park, he was so kind to all his employees. He would recognize their effort with a tip and kind words. One day one of the waitresses was in tears, as the day before a park patron had smashed the window of her car. She couldn't afford to fix it and without hesitation he gave her the money needed to repair it. Randy has a huge heart and is generous to others.

> In the early years of our friendship, he would volunteer in my first-grade classroom. Randy spent a few years volunteering at the Salvation Angel program with me. He also volunteered his time to help Little League teams out to share his love of baseball. Randy would also attend some of my student's baseball games. Randy and I attended the same church, and he was always willing to help when donations were needed. Finally, he took care of his mother in her final years. This is a true testament to the love he has for his family.

Susan Boyd Ltr. (Ex. M).

> I would like to share an experience that impacted my life while playing in a softball tournament in Aurora, Colorado. We were staying in a hotel across the street from the Children's Hospital . . . . Randy called a team meeting in the lobby and through obvious emotion shared with us that he visited the hospital and it brought him to tears. He asked us to find it in our hearts to join in on a donation to the hospital. He was the first to donate and the rest of us followed his lead. With the money we bought toys and games for the children. As a team we went to the hospital to deliver them to the children.

Dominick Calise Ltr. (Ex. N); *see also* Leon Ellis Ltr. (Ex. O) (recollecting the same experience).

> Former employees of Legacy Sports also praise Mr. Miller for his generosity and kindness.

For example, the former Executive Assistant at Legacy Sports writes:

> Throughout my time there, he always treated me with the utmost respect and kindness.

> Randy is a man who genuinely cares for those around him. From the very beginning, he made me feel valued and supported, not just as an employee, but as a person. He extended the same level of care and consideration to others. His

compassion and generosity stood out in every interaction, making a lasting impact
on me.

Elissa Bridges Ltr. (Ex. P).

Others also make clear that Mr. Miller did not act with bad intent and was motivated only

to make the Park a reality and success. For example, a former colleague in the sports industry

wrote:

> Even then Randy's dream was to create a sports complex where youth sports could
> grow and thrive in a safe environment. Randy spent years trying to get his vison
> [sic] to become a reality.

> When Bell Bank Park was announced many of us in the community were so proud
> of Randy finally brining [sic] his dream into reality. The entire youth sports market
> in the greater Phoenix market now had a place to play soccer, football, baseball,
> basketball, and train with Olympic Gold Medal winners.

> This complex also served as a sports tourism as teams from California, Utah and
> Nevada routinely came to the facility to play in tournaments.  The economic impact
> to the community was major as they topped the 1 million mark in attendance after
> their first year.  He created a great family environment where parents could safely
> let their children play.

> Randy's dream and all it could be, came in fruition after years of hard work and
> sacrifice to bring this complex on line.  I do not believe after 30 years trying to do
> bring this complex to reality that he had any nefarious motives.  To get this done
> he choose a very difficult path that included non-profits and other very
> sophisticated financial instruments which in hindsight was not the ideal way to go.

> Please take in consideration Randy's long service to Youth Sports and his dream to
> create something for them. Please be lenient as this man has a great heart and in the
> 30 years I have known him has always put the youth sports community fist [sic]
> and foremost.

Kerry Dunne Ltr. (Ex. Q). Additional letters of support are available at Exhibit R.

Unfortunately, Mr. Miller has faced significant health challenges in recent years. Ltr.

Listing Medical Conditions (Ex. S). In particular, after years of unsuccessful surgeries and

numerous complications with his big toe on his left foot, Mr. Miller underwent surgery earlier this

summer to amputate his toe. Pre-Surgery Instructions for Toe Amputation (Ex. T). Based on this

amputation, Mr. Miller faces significant issues with his mobility and is at greater risk for infection and other complications. Additionally, Mr. Miller has significant additional medical issues, including Hepatitis C, insulin-dependent type 2 diabetes, hypertension, high cholesterol, neuropathy, and significant gastrointestinal issues. Ltr. Listing Medical Conditions (Ex. S). Mr. Miller takes daily medication to manage these conditions and attends regular appointments with his team of doctors in Arizona to treat these issues. *Id.* Notwithstanding his thorough treatment regime, Mr. Miller's health has continued to decline in the last several years, and a sentence of incarceration will likely accelerate this decline.

## IV.   <u>A Sentence of Two Years Is Sufficient, But Not Greater Than Necessary</u>

### A. **Legal Standard**

As this Court is aware, the primary focus of the sentencing inquiry is to determine a sentence that is "sufficient, but not greater than necessary, to comply with the purposes" of 18 U.S.C. § 3553.  18 U.S.C. § 3553(a).  To assist with this determination, the statute provides seven factors the Court should evaluate in considering an appropriate sentence:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed: (i) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (ii) to afford adequate deterrence to criminal conduct; (iii) to protect the public from further crimes of the defendant; and (iv) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for the applicable category of offenses committed by the applicable category of defendant as set forth in the [United States Sentencing Guidelines];
>
> (5) any pertinent policy statement issued by the United States Sentencing Commission;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(1) – (7).

As is set forth below, the application of these factors to this matter demonstrates that a sentence of two years' incarceration is "sufficient, but not greater than necessary, to comply with the purposes" of 18 U.S.C. § 3553.

**B. The Circumstances of Mr. Miller's Non-Violent Offense**

As a preliminary matter, Mr. Miller is a non-violent offender and has been convicted of securities fraud and identity theft. While these charges are serious, it is important to note the backdrop against which these charges arose. Mr. Miller began the Legacy Park project with the intention to build a state-of-the art sports park complex that brought children and families together to play sports and engage in other outdoor recreation activities. This was a venture that he embarked on with his son, Chad, in part due to their mutual passion for sports. What began as an incredibly promising project ultimately fell apart due to a litany of reasons previously described. Without diminishing Mr. Miller's culpability for his conduct, it is important to clarify several points related to the nature and circumstances of his offense.

*i.    Adequacy of Risk Disclosures and Non-Binding Nature of Letters of Intent*

The characterization in the PSR that Mr. Miller personally assured investors of guaranteed contractual commitments is not supported by the actual content of the offering materials provided to investors. The LOM provided detailed and robust disclosures regarding the risks associated with various aspects of the project, including key financial projections and the enforceability of the pre-contracts and LOIs. The offering materials made clear that all financial figures and anticipated revenues were forward-looking estimates, not guarantees, and that actual results could differ

17

materially from those projections. Investors were cautioned that the project's success depended on a variety of factors, many of which were outside the control of the project's management, and that there was no assurance that anticipated facility usage or revenue targets would be met. With respect to the pre-contracts and LOIs, the LOM disclosed that "there can be no certainty as to the enforceability" of those documents. Excerpt from 2020 Offering Memorandum, Risk Factors, at 49 (Ex. U).

The sophisticated institutional investors who participated in the bond offering were thus fully apprised of the inherent uncertainties and risks associated with the project. The LOM's risk disclosures were designed to ensure that investors understood the speculative nature of the financial projections and the unenforceable status of the LOIs and pre-contracts.

    ii.    *The Loss Amount Overstates Mr. Miller's Culpability*

While Mr. Miller fully accepts responsibility for his conduct and has acknowledged his errors in judgment that led to his conviction, the Sentencing Guidelines calculations in this case significantly overstate his individual culpability. The Guidelines' loss calculation—driven by the approximately $250 million in losses associated with the failure of the Legacy Park project— results in a substantial increase to the advisory sentencing range.  However, this figure does not accurately reflect Mr. Miller's personal role or intent, nor does it account for the complex and multifaceted reasons behind the project's ultimate failure, including losses caused by third-party failures beyond his control.

Though Mr. Miller does not dispute the legal basis for the loss amount as calculated under the Guidelines, it is important to recognize that the collapse of Legacy Park was caused by factors unrelated to the conduct underlying Mr. Miller's conviction. The project was an ambitious, large-scale development that faced a host of challenges, including unforeseen market conditions,

operational difficulties, and the unprecedented impact of the COVID-19 pandemic. Many of these factors were entirely independent of any misstatements or forged documents, and would have posed significant risks to the project's success regardless of the conduct at issue.

For example, Legacy Sports had secured hundreds of executed contracts generating substantial actual revenue. Legacy Sports had entered into a management contract with OVG to handle the concession stands, food, merchandise, parking lot operations, and other responsibilities. Unfortunately, OVG significantly underperformed. Had OVG performed even to a reasonable standard in its operational responsibilities, including ticketing, parking, concessions, bars, restaurants, special events, merchandise, and sponsorship sales, the revenue actually produced would have been sufficient to meet Legacy Park's bond obligations. The intended loss figure ignores these contractual commitments as well as the revenue that Legacy Sports in fact produced, and instead attributes to Mr. Miller the entirety of a projected loss driven in substantial part by OVG's operational failures.

Beyond OVG's failure to perform, there were a series of other problems: construction overruns exceeding $100 million, repeated construction delays, operating lines and loans that never materialized, and the COVID-19 pandemic. In fact, during the Park's brief operational period, the sports division generated substantial and verifiable demand. Legacy Park secured over 800 contracts with sports organizations (many of which involved multi-year or recurring programming) and actual attendance exceeded the projections in the 2020 LOM. *See* PSR ¶¶ 10, 81. The Park attracted millions of visitors, making it one of Arizona's most visited attractions throughout the state. Placer.AI Report (Ex. E). These outcomes demonstrated an upward trend in attendance and revenue performance on the sports side.

The Guidelines' mechanical application of the total loss amount thus fails to distinguish between losses directly attributable to the offense and those resulting from broader business failures and external events. A just sentence should take into account not only the legal framework, but also the real-world context in which the loss occurred, and the fact that Mr. Miller's actions were not the sole cause of the project's demise. *See U.S. v. Confredo*, 528 F.3d 143, 152 (2d Cir. 2008) ("[a] defendant should have an opportunity to persuade the sentencing judge that the loss he intended was less than the face amount of the loans."). The mechanical analysis that results in the $250 million loss is neither fair nor a realistic reflection of the true facts. The truth of the matter is that this project failed for many reasons unrelated to the misconduct by the Millers, and that Mr. Miller sincerely wanted this project to succeed, poured his heart into it, and its failure, in many ways, destroyed his life.

  *iii. Mr. Miller Promptly Repaid Bond Proceed Funds that He Used*

Mr. Miller acknowledges that he used bond proceeds for his personal use. However, his use of bond proceeds was not motivated by an intent to defraud or personally enrich himself at the expense of investors, but rather by a genuine—albeit mistaken—belief that he was permitted to temporarily access surplus funds after project obligations were met each month. Throughout the operation of Legacy Park, Mr. Miller's practice was to ensure that all required payments and expenses were satisfied before taking any remaining funds, as the principal behind the development.

Importantly, when Mr. Miller was informed that this practice was not permissible under the terms of the bond agreements, he acted swiftly to repay the funds that he took and he did so within two months.  He immediately repaid the full amount in question, including interest, thereby making the investors whole and demonstrating his commitment to rectifying any

misunderstanding. Mr. Miller's prompt repayment upon learning of the impropriety is compelling evidence of his good faith and lack of intent to permanently deprive the project or its investors of funds.[2]

### C. Mr. Miller Timely Accepted Responsibility for His Conduct and Has Cooperated with Authorities

Mr. Miller's conduct throughout this matter demonstrates a profound acceptance of responsibility and a genuine commitment to the efficient administration of justice. From the outset, Mr. Miller entered into a negotiated plea agreement with the Government, agreeing to plea guilty within approximately two weeks of the filing of the Indictment. Mr. Miller's prompt and voluntary decision to accept responsibility stands in stark contrast to defendants who contest charges or delay resolution, and it reflects Mr. Miller's respect for the law.

By entering a guilty plea at the earliest possible stage, Mr. Miller not only accepted responsibility for his actions but also significantly conserved judicial and prosecutorial resources. He waived his right to discovery, thereby sparing the Government the time and expense associated with preparing and producing voluminous materials. This early resolution allowed the Government to avoid the burdens of pretrial litigation, motion practice and trial preparation, and it enabled the Court to allocate its limited resources to other matters. Such cooperation is precisely the type of conduct that the federal sentencing guidelines and the principles of justice seek to encourage.

Furthermore, since entering his plea, Mr. Miller has demonstrated exemplary compliance with all conditions imposed by pretrial services. He has consistently abided by the terms of his release, maintained regular contact with supervising authorities, and has not engaged in any conduct that would call into question his suitability for leniency. His actions since indictment

---

[2] To the extent that the Government is alleging that Chad Miller had access to the Legacy Sports bank account, that is not accurate, as only Randy Miller had access.

reflect a sincere commitment to rehabilitation and a willingness to accept the consequences of his conduct.

Beyond his acceptance of responsibility in this instant matter, Mr. Miller also stipulated to an enforcement action brought against him by the U.S. Security and Exchange Commission ("SEC") for conduct related to the instant matter. *See SEC v. Randall J. Miller*, 25-cv-02702-JGK, Dkt. 25 (S.D.N.Y.) (Ex. I). Mr. Miller consented to the entry of judgment in that matter, whereby he has agreed to refrain from purchasing or selling securities, in addition to other requirements. *Id.* This judgment further reflects Mr. Miller's acceptance of responsibility for his conduct and his commitment to not engage in similar conduct in the future. *Id.*

Mr. Miller's acceptance of responsibility, combined with his longstanding commitment to community development, demonstrates that his actions were not motivated by personal gain or malice, but rather by an earnest—if flawed—effort to realize a project intended to serve the public good. His early plea and cooperation have spared the Government and the Court significant time and resources, and underscore his respect for the judicial process and his intent to move forward in a positive direction.

In light of Mr. Miller's prompt and unqualified acceptance of responsibility, his cooperation with the Government, and his continued compliance with pretrial supervision, a lenient sentence is both warranted and appropriate. These factors, when considered alongside his advanced age and serious medical conditions, strongly support the imposition of a sentence no greater than two years, consistent with the goals of justice and the interests of judicial economy.

**D. Mr. Miller's Severe Medical Issues Support a Two-Year Sentence**

Recognizing Mr. Miller's advanced age and the multitude of serious, chronic medical conditions from which he suffers, a sentence of anything over two years could amount to a death

sentence. At 70 years old, Mr. Miller faces markedly different and more severe health risks than much of the general prison population. His medical history is extensive and complex: he suffers from Hepatitis C, insulin-dependent type 2 diabetes, hypertension, high cholesterol, neuropathy, significant gastrointestinal issues including a history of esophageal varices and gastrointestinal bleeding, an umbilical hernia with recent mesh complications, and compromised wound healing in his left foot. Ltr. Listing Medical Conditions (Ex. S). The complications to his left foot became so severe that in June of 2025, Mr. Miller was forced to have his left big toe amputated. Pre-Surgery Instructions for Toe Amputation (Ex. T).  As a result, Mr. Miller has had difficulty maintaining stability and he is at a heightened risk of falling. Mr. Miller also suffered third degree burns on his foot for which he sought emergency care, making his ability to move around even more compromised. Ltr. Listing Medical Conditions (Ex. S). In addition to these issues, Mr. Miller's daily regimen includes multiple prescription medications to manage the above-referenced medical conditions, and he has required ongoing medical supervision and intervention.  *Id.* Without proper access to these medications, Mr. Miller's health will be severely compromised and he needs ongoing and continuous treatment in order to manage his conditions and maintain his health.  Lastly, due to Mr. Miller's multitude of medical issues, his body's ability to heal wounds is also compromised, making him particularly susceptible to infection.  *Id.*

BOP has long acknowledged that elderly inmates are among the most medically vulnerable and that the correctional environment poses heightened risks to their health and safety. The combination of Mr. Miller's age and his serious health conditions renders him particularly susceptible to the physical and psychological harms of incarceration. The federal courts have recognized that advanced age and medical vulnerability are highly relevant factors in determining a just and reasonable sentence. *See, e.g.*, *United States v. Booker*, 543 U.S. 220, 245 (2005)

23

(emphasizing the need for individualized sentencing); 18 U.S.C. § 3553(a)(2)(D) (requiring courts to consider the need for medical care in the most effective manner). BOP has struggled to provide adequate care for inmates with complex medical needs, and the risk of inadequate treatment, delayed care, or exacerbation of existing conditions is substantial. In Mr. Miller's case, the risk is not hypothetical: his toe amputation, compromised wound healing, history of falls, and neuropathy underscores the dangers he faces in a custodial setting.

Moreover, the COVID-19 pandemic has further highlighted the vulnerability of elderly and medically compromised inmates, leading to a renewed focus on compassionate release and the need to avoid unnecessary incarceration of those least able to withstand its rigors. While Mr. Miller is not presently seeking compassionate release, the same considerations of medical vulnerability and diminished risk of recidivism that underlie such relief are directly relevant to the Court's sentencing determination. A sentence of no more than two years would serve the purposes of punishment and deterrence, while also recognizing the extraordinary hardship that a longer term would impose on Mr. Miller given his age and health. Such a sentence would be "sufficient, but not greater than necessary," to achieve the goals of sentencing under 18 U.S.C. § 3553(a), and would reflect both the seriousness of the offense and the unique circumstances of the defendant before the Court.

### E. Mr. Miller is Supported by a Strong Community

As is made evident by the numerous letters of support attached to this memorandum, Mr. Miller is a beloved member of his Phoenix, Arizona community. *See* Additional Letters of Support (Ex. R). He is the loving father of two sons and grandfather of four, and he is surrounded by family and friends who will support him following his sentence.

Mr. Miller is also a man of faith, which he has leaned on to help him navigate his indictment and acceptance of responsibility. He is an active member of his Christian community in Phoenix, where he often attends church services at Christ Church of the Valley.

### F. A Two-Year Sentence Adequately Reflects the Seriousness of the Offense and Promotes Deterrence

The Sentencing Reform Act requires courts to consider the "seriousness of the offense," the need to "promote respect for the law, and to provide just punishment." 18 U.S.C. § 3553(a)(2)(A). Without diminishing the seriousness of Mr. Miller's conduct, the offenses to which he pled guilty are non-violent financial offenses. As a result, Mr. Miller has agreed to substantial forfeiture—$7,289,134.89—which he will undoubtedly be paying off for the rest of his life and will serve as an additional reminder of the consequences of his actions, on top of any period of incarceration. Here, a two-year sentence considers the seriousness of the offense and promotes respect for the law while imposing a fair and just sentence.

The Sentencing Reform Act also requires courts to impose a sentence "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). Here, the public does not need to be protected from Mr. Miller. Again, Mr. Miller pled guilty to two non-violent financial-related offenses. Mr. Miller has accepted responsibility for his criminal wrongdoing and has also consented to an SEC enforcement action whereby he has agreed to not sell or purchase securities in the future. If there were any need to protect the public from Mr. Miller, that need is mitigated by the SEC judgment. Mr. Miller has never been convicted of any violent offense and the only other offense for which he has been convicted is a nearly three-decade-old obstruction of justice offense for which he was sentenced to two years' probation. As a result, Mr. Miller has a criminal history level of 1 under the Sentencing Guidelines and a sentence of two years is more than enough to account for the seriousness of his conduct and to promote deterrence.

### G.  The Mandatory Minimum Sentence is Appropriate

Mr. Miller acknowledges that his conviction for aggravated identity theft requires a mandatory two years' imprisonment, to run consecutively with any sentence imposed related to his securities fraud conviction. Notwithstanding this mandatory minimum sentence, Mr. Miller submits that any sentence of incarceration over the minimum required sentence of two years would be excessive in light of the nature and circumstances of his offense, as detailed above. Mr. Miller has accepted responsibility and consented to the forfeiture order, and due to his advanced age and his myriad health conditions, any sentence longer than two years would put his health and physical well-being in serious jeopardy.

Moving forward, Mr. Miller is ready to put this matter behind him, accept responsibility for this conduct, and serve his time. He looks forward to his subsequent release back into the community where he can be a productive member of society. In his remaining years of life, Mr. Miller is eager to spend time with his family and loved ones and give back to his community. While in custody, Mr. Miller will do his best to obtain his good time credit and utilize his time effectively so that he can re-enter society as a better man.

### V.    Self Surrender is Appropriate, Which the Government Consents To

In light of the above-referenced factors, including Mr. Miller's compliance with his pretrial release conditions, the nature and characteristics of Mr. Miller's non-violent offense, his prompt entry of a guilty plea, and his age and medical circumstances, Mr. Miller submits that self-surrender to the designated BOP facility, rather than being remanded immediately to custody, is appropriate. The Government consents to self-surrender.

Should Mr. Miller be remanded to BOP custody, he will be detained at the Metropolitan Detention Center (MDC) in Brooklyn—a facility that suffers from well-documented harsh and

inhumane conditions. Allowing for self-surrender would not only facilitate a more safe and orderly transition to incarceration, but it would also avoid subjecting Mr. Miller to the uniquely severe and punitive environment at MDC Brooklyn, which has been the subject of significant judicial and public concern.

MDC Brooklyn has repeatedly been cited for its substandard and, at times, inhumane conditions. In recent years, the facility has faced widespread criticism for chronic overcrowding, inadequate medical care, and frequent lockdowns that severely restrict inmates' access to basic necessities, including showers, recreation, and legal counsel. Reports from the U.S. Department of Justice Office of Inspector General and advocacy organizations have detailed persistent issues such as unsanitary living conditions, rodent infestations, and insufficient mental health services.

These concerns are not merely anecdotal. In August 2024, the Honorable Judge Pamela K. Chen of the U.S. District Court for the Eastern District of New York issued a detailed order, describing MDC Brooklyn as a place where "[c]haos reigns, along with uncontrolled violence." *United States v. Colucci*, 743 F. Supp. 3d 452, 458 (E.D.N.Y. 2024). The order further noted that pretrial and presentence detainees at MDC Brooklyn are often subjected to conditions more severe than those at designated BOP facilities, and that these hardships are not justified by any legitimate penological interest. *Id.* at 462. ("[T]he present conditions at MDC make such a sentence materially different than one served at a jail or prison elsewhere in the United States that is appropriately managed. A sentence served at MDC is materially different and necessarily disparate from one served elsewhere.").

Permitting Mr. Miller to self-surrender would avoid the unnecessary hardship of a prolonged stay at MDC Brooklyn while awaiting designation to a longer-term minimum or low security BOP facility. As stated above, Mr. Miller faces numerous medical conditions, including

hepatitis C, Type 2 diabetes, hypertension, neuropathy, and gastrointestinal issues. Remanding him to a facility where he may not be able to seek adequate care will be detrimental to his health— or fatal. Allowing for Mr. Miller's self-surrender also will enable Mr. Miller to make necessary personal, familial, and medical arrangements, ensuring a smoother transition and better compliance with the Court's sentencing objectives. In light of the extraordinary, well-documented challenges at MDC Brooklyn, the interests of justice strongly favor allowing Mr. Miller to self-surrender directly to his designated facility.

## VI.    Bureau of Prison Designation

We respectfully request that Your Honor provide a judicial recommendation to BOP that Mr. Miller be designated to the minimum security satellite camp at USP Tucson, located in Tucson, Arizona. Such a designation would allow for family visitation and facilitate an eventual successful reentry into the community. The satellite camp at USP Tucson is well suited for Mr. Miller because of the circumstances surrounding his non-violent offense, his age, his medical condition, and the importance to his rehabilitation that he be close to his family.

## VII.    Conclusion

After reviewing all of the relevant factors contained in 18 U.S.C. § 3553(a), Randy Miller respectfully requests that this Court sentence him to no more than two years in custody, permit him to self surrender, and recommend to the BOP that he be designated to USP Tucson's minimum security satellite camp.

Dated: August 26, 2025                              Respectfully submitted,


                                                    */s/ Timothy Sini*
                                                    Timothy Sini

                                                    **NIXON PEABODY LLP**
                                                    75 Broadhollow Road, Suite 300
                                                    Melville, NY 11747
                                                    (516) 832-7655
                                                    tsini@nixonpeabody.com
                                                    *Counsel for Randy Miller*