

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

September 2, 2025

**BY ECF**

The Honorable Lewis A. Kaplan
United States District Judge
United States Courthouse
500 Pearl Street
New York, NY 10007

     Re:    ***United States v. Randy Miller*, 25 Cr. 138 (LAK)**

Dear Judge Kaplan:

     The Government respectfully submits this memorandum in advance of the September 9, 2025 sentencing for defendant Randy Miller.

     The defendant and his co-conspirators, including his son, Chad Miller, forged documents and falsified revenue projections to convince investors to purchase over a quarter billion dollars in municipal bonds that the defendant sold to build Legacy Sports Park ("Legacy Park") in the Arizona desert. Legacy Park ultimately was not financially viable, and the bonds are now worthless, resulting in hundreds of millions of dollars in losses to investors. In the course of their scheme, the defendants also committed aggravated identity theft by using the identities of dozens of individuals to make it appear there was real customer interest backing the bond offering.

     For the reasons set forth below, the Government respectfully submits that the Guidelines sentence of 84 months' imprisonment—the same sentence recommended by the Probation Office—would be sufficient but not greater than necessary to achieve the purposes of sentencing.

## I. Background

### A.    The Offense Conduct

     Randy Miller was the President of Legacy Sports USA LLC ("Legacy Sports"), which operated Legacy Park, a massive sports and entertainment complex in Mesa, Arizona. From in or about November 2019 through at least in or about July 2021, Randy Miller, his son Chad Miller, who was the Legacy Sports CEO, and others lied to bond investors about the volume and level of interest that youth sports organizations had in using Legacy Park. (PSR ¶ 9). The Millers and their co-conspirators fabricated and forged letters of intent and so-called "pre-contracts" that bore the names of persons and organizations that did not approve them, including youth sports programs and other sports-related organizations. (PSR ¶ 10).

These forged documents claimed that major sports organizations had made binding commitments to use Legacy Park for a fabricated number of tournaments, with fabricated numbers of participants and expected spectators. Some of these forgeries were created from whole cloth by the defendants and their co-conspirators. Others used as their starting point real letters the defendants had obtained from sports organizations that expressed soft interest in or support for the Park, which the Millers fabricated into "binding" commitments to relocate to Legacy Park and inflated the importance of the commitment by adding fictious events, tournaments, or participants to the details, if any, that the organization had actually provided in the original letter. The Millers then used these forged documents to generate falsely inflated projected revenues for Legacy Park, which were presented to prospective bond purchasers as projections based not on mere speculation or market research, but on the supposed binding commitments of over 50 sports organizations.

The defendants conveyed these forged documents and fraudulent projections to prospective investors to obtain approximately $284 million in municipal bond financing. (PSR ¶ 11). Specifically, to build Legacy Park, the Millers sold to investors revenue-backed municipal bonds issued by the Arizona Industrial Development Authority, acting as a conduit for the entities that controlled Legacy Park—*i.e.*, bondholders would be paid only from the revenue generated by the Park. In the initial bond offering memorandum (the "Initial Offering Memorandum"), investor presentations, and materials made available to potential investors in a data room (the "Data Room"), the Millers claimed that Legacy Park expected to generate approximately $96.3 million in revenue after its first full year of operations in 2022. (PSR ¶¶ 22-23, 27-28, 29). That projection was based substantially on these false letters of intent and pre-contracts, which the Millers used to model that Legacy Park would be 100% occupied from opening and be able to meet the debt service commitment of the Legacy bonds. (PSR ¶¶ 23, 27).

In August 2020, the initial bond offering closed and generated approximately $251 million in bond proceeds. (PSR ¶ 33). In June 2021, Legacy Park raised another approximately $33 million in a supplemental bond offering that continued to incorporate these misrepresentations from the initial bond offering. (*Id.*).

Legacy Park opened in or about January 2022 and immediately began underperforming the Millers' revenue projections. (PSR ¶ 65). The park generated only approximately $14.7 million in revenue in its first six months of operation, as compared to $96.3 million that the Millers had projected Legacy Park would make in 2022. (PSR ¶ 65). In particular, Legacy Park was 43% off its budget in the first quarter of 2022 and 59% off budget in second quarter of 2022. (PSR ¶ 65). Legacy Park failed to make a single payment on its bonds. The first bond payment came due in August 2022, Legacy Park defaulted in October 2022, and then declared bankruptcy in May 2023. (PSR ¶ 67-70). Bondholders recovered no more than approximately $2.5 million in total—less than 1% of their investment.

The defendant's forgery scheme dates back to well before the Ziegler-led municipal bond financing effort commenced. Randy Miller began soliciting interest in building what ultimately became Legacy Sports Park almost 20 years prior. There were at least three iterations of the project at different sites in Arizona over the years, and, at various times, Miller worked with different financial backers and construction companies to try to generate sufficient investment to facilitate the building of the sports park. (PSR ¶ 13).

As part of that plan, Miller hired Sports Facilities Advisors ("SFA") in 2016 to perform a third-party feasibility study on the proposed project, which Miller intended to use to solicit investors in the project. (PSR ¶ 14). But SFA refused to validate Miller's extremely aggressive assumptions about the financials of the project. (PSR ¶¶ 15-16). Ultimately, SFA issued a pro forma using the assumptions Miller directed, but caveated that report with several stark warnings: the assumptions were directed to be included by Miller and his team; SFA had not validated that data; and SFA did not anticipate Legacy Park would perform as Miller hoped. (PSR ¶¶ 17-18). By at least January 2018, the Millers and their co-conspirators started using the numbers SFA generated to solicit investors, but specifically excluded the express caveats SFA had included and changed the date of the study to make it look nearly a year more recent. (PSR ¶ 19). And the Millers substituted their own cover letter in their business plans that stated, contrary to SFA's actual conclusions, that SFA had "concluded that [all] the information provided meets their requirements for acceptance and validation into the development of this pro forma." These business plans included letters of intent that even by as late as April 2019, six months before Randy Miller was introduced to Ziegler, were forged and altered to inflate anticipated attendance and revenues.

In November 2019, when Zeigler agreed to assist the Legacy team in financing the project through municipal bonds, Randy Miller and his co-conspirators turbocharged their fraud. As outlined in the tables in paragraphs 45 and 46 of the PSR, the defendant and his co-conspirators forged or misleadingly altered letters of intent or pro-forma contracts for 35 of the 54 organizations who were purportedly committed to the Legacy Park project, accounting for nearly 30% of the anticipated $96 million in year one revenue investors were told Legacy Park expected to generate. (PSR ¶¶ 45-47). The defendant's fraud included the forging and copying signatures for marquee sports organizations like the Special Olympics, the Fiesta Bowl, Manchester United, Real Salt Lake, and many other youth sports organizations that had no idea the Millers were forging or altering their documents and using their names and reputations to solicit interest in the park. (PSR ¶¶ 34-44).

The forgeries spanned all types of documents used to get the bond offering over the finish line. It started with the letters of intent that Miller and his team had been soliciting as early as the SFA days in 2016. When Zielger suggested Legacy ask their customers to sign so-called "pre-contracts" that would show a firmer intent to use the Park when it opened, the Millers forged the vast majority of those pre-contracts. When the financing legal team asked for the customers to sign assignments that would move their commitments from Legacy Sports to Legacy Cares, the non-profit that formally owned the Park, the Millers forged those too. (PSR ¶¶ 38-42).

Randy Miller's sentencing brief appears to claim Legacy Sports' Chief Operating Officer, Jeff De Laveaga, was the primary actor responsible for the forging scheme as a response to pressure exercised by Ziegler in 2020. (Def. Ltr. at 4-5). De Laveaga knowingly participated in the forgery scheme and has pleaded guilty for his conduct. *See United States v. Jeff De Laveaga*, 25 Cr. 127 (RA). But the evidence collected by the Government shows that: (1) the Millers fraudulently altered letters of intent even before De Laveaga joined the Legacy team; (2) many of the letters and the majority of the pre-contracts were forged without De Laveaga's involvement, even after he joined Legacy, including the Fiesta Bowl letter and others; and (3) De Laveaga

engaged in this scheme at the direction of Randy and Chad Miller, who were ultimately responsible for the fraud and profited the most from it.

For example, the owner of the performance coaching company for which the defendants attributed $1.85 million in year one revenue (Indictment ¶¶ 10, 11, 15), provided Randy Miller a letter of intent in 2018, which the defendants subsequently altered to change the date and inflate the expected revenue and attendance figures, along with the forged pre-contract promising to relocate his business to Legacy Park. That owner had minimal dealings with Chad Miller and met Jeff De Laveaga once or twice. Similarly, the volleyball consultant who provided Randy Miller with a letter of intent in 2016 that was later fraudulently altered by the defendants told Miller that the volleyball club he was working with did not intend to use Legacy Park or be part of the project. (Indictment ¶ 15). Randy Miller directed some of these fraudulent alterations—for example, by providing handwritten edits to Chad Miller on pre-Ziegler Legacy Sports business plans to alter the dates on letters of intent to make those letters look more recent.

The forgeries the defendant and his co-conspirators prepared for the Ziegler-led bond financing were used to convince investors to purchase the Legacy Park bonds through multiple avenues. First, the forged documents—the letters of intent and pre-contracts—were themselves made available to potential investors through the electronic Data Room that Ziegler provided. (PSR ¶ 29). Second, the Millers used the inflated attendance and revenue projections they fabricated in those documents to generate revenue projections in a spreadsheet called the pro forma, which was also made available to investors and incorporated into various investor documents like the Initial Offering Memorandum. (PSR ¶ 44). Third, the Millers touted the false commitments to Legacy Park and the supporting revenue projections in both the Initial Offering Memorandum and in the investor presentation that Chad Miller, Ziegler, and others held prior to the bond offering closing. (PSR ¶¶ 44, 49). And fourth, the defendants used the fabricated letters to support the purported validation of the project, both through the altered and misleadingly presented SFA analysis, and through the "peer review" of the SFA study by Johnson Consulting. (PSR ¶ 48).[1]

Miller claims that the attendance projections were "based on limited research and historical data obtained from other similar sports complex projects" and that the Millers "deferred to other Legacy Sports' executives, who confirmed to them that these practices were acceptable given the existing relationships between Legacy Sports and the several sports organizations." (Def. Ltr. at 6). This is contrary to the evidence obtained by the Government, which supports that, as far back as 2016, Randy Miller was directing people involved in the Legacy Park project, such as SFA, to incorporate wild and facially implausible assumptions into sports revenue projections.

For example, as support for its revenue projections Legacy provided SFA a letter of intent from SC del Sol, a youth soccer club, which stated that "SC del Sol will transfer ownership of club operations including competitive teams, tournaments, and any other associated programs to Legacy Sports Park and Legacy Sports LLC." (Ex. E at 99). After receiving that letter of intent

---

[1] For the Court's benefit, the Government is filing the Initial Offering Memorandum as Exhibit A, the slide deck used during the investor presentation as Exhibit B, a transcript of the investor presentation as Exhibit C, and the pro forma made available in the data room as Exhibit D.

and noting that the verbiage was identical to a separate basketball letter of intent and that SC del Sol's president's name was misspelled on the bottom, an SFA employee called the SC del Sol president to confirm the contents of the letter. The SC del Sol president told SFA that he had not signed the letter and had not had any conversations with Legacy about folding their business into Legacy, instead, he had just discussed renting fields, and did not currently have any of the various additional revenue sources cited in the letter. (Ex. F at 1); *accord id.* ("Client [Randy Miller] has been defensive in our lack of understanding of the soccer market and the current book of business but have not produced any actuals. Have repeatedly asserted all business, including competitive and tournaments, be shown as in house."). Similarly, during the SFA process, a witness told the Government that Randy Miller would make incredible assumptions along the lines of, if a soccer organization has a certain number of teams using 4 fields, Miller would assume the number of teams would double if Legacy offered them 8 fields.

Randy Miller, as the President and driving force behind Legacy Park for nearly two decades, orchestrated this "whatever-it-takes" approach to defrauding investors and securing financing for his project. And, while he delegated the bulk of the work involving forging documents and generating false revenue projections to his son and others working for the Millers, Randy Miller also participated directly when necessary. For example, he reviewed the falsely generated consent to assign forms to ensure no typos were added in the forging process. (PSR ¶¶ 40-41). When it was unclear whether SFA would agree to assign its prior study to Legacy Cares in time, Randy Miller told his son to be prepared to forge that signature too, if needed. (PSR ¶ 42).

And Randy Miller and his son made millions directly off the fraud. When the bond proceeds hit the Legacy Sports operating account that Randy Miller controlled, Miller used the funds to pay himself and his family members extravagant salaries, purchase luxury vehicles for their personal use like a $135,000 Cadillac Escalade for Chad Miller, pay off other debts, and fund their next ventures. Randy Miller received approximately $1.3 million in salary and check and cash withdrawals, and used $513,000 towards payment on his house and title insurance. Randy Miller also used approximately $830,000 to pay lawsuit settlements. He repaid approximately $1.8 million of that, only after Legacy's CFO (and former investment banker at Ziegler) caught some of the misspending and confronted the Millers, demanding that they repay what they had taken and "pray this isn't questioned." (PSR ¶ 63). To make those repayments, Randy Miller solicited a third party who purchased $4.5 million in Legacy Sports equity from Randy Miller (PSR ¶ 64), after receiving many of the same false financial documents that were provided to Legacy Park bond investors. In total, Randy Miller is being held responsible for approximately $7.2 million in forfeiture based on his direct control over these misappropriated funds.

**B.     The Defendant's Plea, Guidelines Range, and Monetary Penalties**

On April 1, 2025, the defendant was arrested on the charges in the indictment (the "Indictment"), which charged four counts: one count of conspiracy to commit securities fraud and wire fraud in violation of 18 U.S.C. § 371 one count of substantive securities fraud, in violation of 15 U.S.C. §§ 78j(b), 78ff, and 17 C.F.R. § 240.10b-5; one count of substantive wire fraud, in violation of 18 U.S.C. § 1343; and one count of aggravated identity theft, in violation of 18 U.S.C. § 1028A.

On May 28, 2025, the defendant pleaded guilty, pursuant to a plea agreement (the "Plea Agreement") before Magistrate Judge Robyn A. Tarnofsky, to Counts One and Three of the S1 superseding information (the "Information"), which charged the defendant with securities offering fraud, in violation of 15 U.S.C. §§ 77q & 77x, and 18 U.S.C. § 2 (Count One) and aggravated identity theft, in violation of 18 U.S.C. §§ 1028A(a)(1), 1028A(b) and 2 (Count Three).

As agreed to by the parties, and as calculated by the Probation Office, the Stipulated Guidelines Sentence is 60 months' imprisonment, with a mandatory consecutive 24 months' imprisonment on Count Three, for a total of 84 months' imprisonment. (PSR ¶ 149.) Probation recommends the defendant be sentenced to the Guidelines sentence of 84 months' imprisonment. (PSR at 42.) As set forth in the Plea Agreement, and pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), the Government seeks forfeiture in the amount of $7.29 million (PSR ¶ 162), and the Court has entered a Preliminary Consent Order of Forfeiture and Money Judgment.

The Government anticipates submitting a request for restitution, and requests 60 days under the MVRA to collect the information from impacted victims and make that submission.

## II.  The Sentencing Guidelines and Section 3553(a) Factors

The Sentencing Guidelines promote the "basic aim" of "ensuring similar sentences for those who have committed similar crimes in similar ways," *United States v. Booker*, 543 U.S. 220, 252 (2005), and so "to secure nationwide consistency, the [Sentencing] Guidelines should be the starting point and the initial benchmark," *Gall v. United States*, 552 U.S. 38, 49 (2007). Along with the Guidelines, the other factors set forth in Title 18, United States Code, Section 3553(a) must be considered. Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two. That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

Section 3553(a) further directs the Court to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

### III.   The Court Should Impose the Guidelines Sentence

The Guidelines sentence of 84 months' imprisonment—with 60 months for the defendant's commission of the fraud and two mandatory consecutive years for his aggravated identity theft—would be sufficient but not greater than necessary under the relevant Section 3553(a) factors.

### A.   A Significant Sentence is Necessary in Light of the Nature and Seriousness of the Offense, the Need to Promote Respect for the Law, and the Need to Provide Just Punishment

A significant incarceratory sentence of 84 months' imprisonment is necessary in light of the nature and circumstances of the offense and the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. *See* 18 U.S.C. § 3553(a)(1) & 3553(a)(2)(A).

The defendant's fraud was brazen in its deception and long-running in its scope. He and his co-conspirators forged letters from sports organizations, large and small, established and new, that all touted their—non-existent—commitment to bringing all their events and customers to his mecca in the Mesa desert: a mega sports park in the West to rival Disney's Wide World of Sports in the East. By stealing the names and reputations of these organizations and their principals, the defendant was able to hoodwink investors into giving him a quarter of a *billion* dollars to build a massive sports complex. And, when the mirage of expected revenue he created failed to appear, the project failed, leaving investors holding the bag and recovering just pennies on the dollar.

This was a scheme that took years to come to fruition. It took dedication to the fraud—enlisting his son and business partners to do the dirty work of creating the forgeries. It took planning and commitment to deceive not only investors, but the investment bank, the consultants, the potential customers, and the countless others involved in getting a project like this off the ground.

It was a scheme that harmed a wide range of innocent victims. While the bond investors are major institutional investors like PIMCO, Vanguard, and others whose existence was not jeopardized by this failure, these entities invested the monies of pension funds, retirement accounts, and so on—ordinary investors. The investment professionals at these firms count on the accuracy and truthfulness of the investment opportunities they are making for their clients, particularly in highly regulated investments like municipal bonds. The defendant's fraud also had collateral consequences on others, like vendors who provided goods and services to Legacy Park and are still owed money that they have not recovered in the bankruptcy.

And it was a scheme that directly lined the pockets of the defendant and his family members, to the tune of millions of dollars.

The defendant raises several arguments in support of his request for a below-Guidelines sentence of two years' imprisonment. He first argues that the bond offering materials did not promise that the letters of intent or pre-contracts were enforceable commitments, and that investors were informed in the memorandum's risk disclosures that the agreements were legally

unenforceable and subject to change. (Def. Ltr. at 17-18). The defendant further argues that the offering documents made clear that the financial projections were not guarantees of revenue, and "[t]he sophisticated institutional investors who participated in the bond offering were thus fully apprised of the inherent uncertainties and risks associated with the project." (Def. Ltr. at 18).

Of course, all projections are subject to change, and the Government is not alleging that the defendants tricked investors into thinking these were legally enforceable contracts. The fraud, however, was that the defendant's representation that these letters and pre-contracts were *authentic*, such that the financial projections had a basis in reality, not mere speculation and certainly not fraud. Notwithstanding the risk disclosures, the bond offering materials repeatedly touted the pre-contracts as "binding" commitments from the organizations "indicating their commitment to use" Legacy Park. (PSR ¶ 22). It also claimed that letters of intent were signed by organizations that had "confirmed their commitment to use Legacy Sports Park" and would sign the pre-contracts after construction groundbreaking. And the letters of intent and pre-contracts were falsely represented as "binding" for the purpose of misleading investors about the firmness of the customer commitments, *i.e.*, these were real customers who were raring to use Legacy Park, not that Legacy would sue them if they breached the letters. During the investor presentation, for example, Chad Miller repeatedly touted these "binding" letters of intent and precontracts as supporting Legacy's expectation that the Park would be "100%" fully utilized from opening. The fraud, in short, was these "binding" commitments were authored by the defendants, not the unsuspecting organizations who were victims of the defendants' identity theft.

The defendant further argues that the Guidelines range is driven almost entirely by the loss amount and overstates his culpability because the Legacy Sports project failed for reasons unrelated to his fraud. (Def. Ltr. at 2, 18-19). Whether Legacy Sports Park failed solely because of the defendants' fraud or for multiple reasons is immaterial, both as a matter of law and in assessing the defendant's culpability. The defendant misled investors about the amount and level of financial commitment that the Legacy Sports project had obtained from sports leagues. As a result, investors were presented with highly misleading revenue projections, which made the project appear financially viable and led to a successful bond offering. Had the defendants not lied to investors and submitted forged documents, the project would not have gotten off the ground. There is no need for the Court to disentangle the effect of the defendant's fraud from alleged post-offering contractual failures or unexpected complications created by other parties or events.

Moreover, even assuming for the purpose of argument that the Guidelines loss amount of $284 million overstates the defendant's culpability, any overstatement has already been incorporated into the parties' Plea Agreement, which caps the maximum available sentence here well below the Guidelines that would apply for a $284 million loss amount. At offense level 35, the level corresponding to a loss amount of $284 million, the Guidelines range for the defendant's conviction would have been 168 to 210 months' imprisonment, plus an additional 24 months' consecutive on Count Three (PSR ¶ 149), meaning a combined Guidelines range of 192 months to 234 months' imprisonment. Because, however, the statutory maximum on Count One, the securities offering fraud count that the defendant pleaded guilty to, is only 60 months' imprisonment, the defendant received a 108 to 150-month discount off a purely loss-amount driven Guidelines range. In effect, the Guidelines sentence of 60 months on Count One is the same as if the loss amount calculation were 10 levels lower, *i.e.*, between $3.5 million and $9.5 million, which

is the range Randy Miller would have fallen in based solely on the $7 million he personally obtained from the scheme.

In short, if anything, the loss amount that effectively applies given the statutory cap far understates rather than overstates the defendant's culpability in this scheme and the massive harm he caused investors. Moreover, as discussed below, the fact that the statutory cap in this agreed-upon resolution has already reduced the otherwise applicable Guidelines range by 108 to 150 months' imprisonment is itself the response to the defendant's request for a reduced sentence of imprisonment based on other factors, such as his health and age. The parties' agreement has already accounted for the appropriate amount of leniency in this case with the statutory cap.

The defendant next claims that while he did use bond proceeds for his personal expenditures, he did so based on a "genuine" belief that this was permissible. The defendant further argues that when he was informed that he was not allowed to use bond proceeds for major personal expenses, he "acted swiftly to repay the funds that he took and he did so within two months." (Def. Ltr. at 20). Those arguments strain credulity from a defendant who has both prior financial experience and close familiarity with the Legacy Park bond documents. With that background, it is unrealistic to believe that he thought it was appropriate to spend more than $500,000 of bond proceeds for a public works project on a personal house, withdraw more than $464,000 from bond proceeds in cash (beyond salary), and purchase an $80,000 car for his son Brett Miller, or a six-figure luxury SUV for Chad Miller. Moreover, the evidence indicates that the defendant's explanation for the Court at sentencing is straight out of the playbook he and his co-conspirators developed at the time the defendant was confronted about his misdeeds. Indeed, after Legacy Sport's CFO questioned the defendant's spending, the defendant, Chad Miller, and the CFO agreed that after paying back some of the money, they would "pray this isn't questioned," and "if brought up … plead ignorance and show remedy." (PSR ¶ 63). Moreover, while the defendant repaid some of his personal expenditures, he did not, and to this day has not, repaid the money used to settle approximately the approximately $830,00 in lawsuits, which were categorized in Legacy Cares books as "startup costs," and approximately $196,000 used to pay for luxury vehicles, which were treated as "fixed assets – auto" by Legacy Cares.

In light of the seriousness of the offense and the harm it caused, a punishment that is just and commensurate with the defendant's conduct is required. Justice requires that Miller be punished with a significant incarceratory sentence. A five-year sentence for his securities offering fraud, plus two years for his involvement in identity theft, is necessary to reflect the seriousness of the defendant's conduct.

**B.  Deterrence Warrants a Significant Incarceratory Sentence**

Both general and specific deterrence support the imposition of the Stipulated Guidelines Sentence.

The Court's sentence must specifically deter Randy Miller from committing additional criminal activity. Miller directly and repeatedly engaged in this flagrant securities fraud scheme. This was a scheme that ultimately resulted in the failed Legacy Park bonds, but, as outlined above, dated back years. It extended beyond the municipal bonds themselves, to include the deception to

the third-party investor in Legacy Sports that Miller used to repay the money he took from the bond offering. The scope and extent of the defendant's criminal conduct itself requires a significant sentence of imprisonment to further deter the defendant from engaging in illegal conduct that targets and harms innocent investors.

It is also notable that this is not Miller's first federal criminal conviction. In 1997, Miller pled guilty in the Eastern District of Virginia to obstruction of justice. (PSR ¶ 96). He was sentenced to 2 years' probation with 6 months' home confinement. (*Id.*). While the Government does not know all the details of this conviction, based on the limited information the Government has been able to obtain, it appears to relate to the defendant's participation in a prior investment fraud scheme, and while the conviction is nearly three decades old, the fact that Miller has already been convicted of a federal offense involving deception and nevertheless committed the instant offense reflects that this is not an isolated mistake, and further adds to the need for specific deterrence. It is also reason to conclude that prosecution alone will not deter Miller, and even at his current age he remains at risk of recidivism.

Indeed, Miller has acted and appears to have continued to act as though the law does not apply to him. During the execution of a search warrant at the defendant's home in May 2024, agents discovered three handguns, one in a car glovebox, one in a nightstand, and one in a kitchen drawer.[2] Accordingly, given his prior federal felony conviction, it appears that Miller possessed these firearms illegally. *See* 18 U.S.C. § 922(g). In addition, after his arrest in this case, the Government consented to the entry of a bond with strict release conditions, including that the defendant seek approval from the Government and Pretrial Services before engaging in any financial transaction exceeding $10,000. The Government has only recently learned—not from the defendant—that between April 28 and July 9, 2025, the defendant withdrew approximately $50,000 in cash from his bank account through six withdrawals at four different branch locations in the Phoenix area, with no cash withdrawal greater than $9,500, engaging in apparent structuring to avoid detection.

General deterrence is also important here. *See* 18 U.S.C. § 3553(a)(2)(B). The Second Circuit and courts in this district have noted the appropriateness of significant sentences in the context of financial crimes committed by defendants who make the calculation that white collar crime is "a game worth playing." *United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013) (quoting district court and affirming sentence of 66 months' imprisonment for insider trading offense where defendant made approximately $11.5 million). And, as the Eleventh Circuit has noted, in passing the Sentencing Reform Act, "Congress was especially concerned that prior to the Sentencing Guidelines, [m]ajor white collar criminals often [were] sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006); *see also id.* ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.").

---

[2] The defendant's girlfriend claimed to own one of the handguns, but did not claim the other two.

### C.   A Significant Sentence Is Necessary to Avoid Unwarranted Sentencing Disparities

Relative culpability and the defendant's personal characteristics also warrant a Guidelines sentence. "In imposing a sentence, the district court is required to consider, among other things, 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.'" *United States v. Frias*, 521 F.3d 229, 236 (2d Cir. 2008) (quoting 18 U.S.C. § 3553(a)(6)). As the Second Circuit has repeatedly observed, however, sentencing disparities are not "unwarranted" where defendants are not "similarly situated." *United States v. Wills*, 476 F.3d 103, 109-10 (2d Cir. 2007).

Randy Miller was the leader of the Legacy Park project, and a leader of this scheme to defraud its investors. He directed the scheme, he benefited the most financially and professionally from the fraud, and he is therefore most responsible for this crime. His sentence should reflect that role.

Relative culpability should also reflect that this defendant should be treated like others in this District who have engaged in investment fraud schemes, involving similar amounts of losses, and were sentenced to significant incarceratory sentences. *See, e.g.*, *United States v. Galanis*, No. 15 Cr. 643 (PKC) (defendant sentenced to 10 years in prison for defrauding investors in connection with tribal bond issuance, resulting in $60 million in worthless bonds); *United States v. Alexandre*, No. 22 Cr. 326 (JPC) (defendant sentenced to 9 years in prison for defrauding investors in his cryptocurrency trading platform into investing $248 million, and misappropriating approximately $14 million); *United States v. Del Valle*, No. 14 Cr. 342 (RMB) (defendant sentenced to 98 months for defrauding investors out of millions of dollars in connection with real estate development project, misappropriating funds, and committing identity theft); *United States v. Meli*, No. 17 Cr. 127 (KMW) (defendant sentenced to 78 months in connection with Broadway ticket resale investment scheme defrauding investors of approximately $100 million, where defendant used portion of money on personal expenses). Notably, even when compared to these other prosecutions, the defendant's scheme involved more investor losses and involved identity theft—factors that make his offense comparatively more egregious than each of these cases, and other similar cases, in the District.

The defendant asks the Court to sentence him to two years' imprisonment based on several factors, including his "prompt" acceptance of responsibility in connection with a plea agreement and information, and his agreement to pay forfeiture. (Def. Ltr. at 1). But since the defendant is facing two years of mandatory, consecutive imprisonment for his aggravated identity theft, such a sentence would effectively mean a sentence of no imprisonment for the defendant's serious securities fraud. Such a sentence would undermine the seriousness of the offense and deterrence. Additionally, while it is true that the defendant promptly entered a guilty plea after charging, the agreed-upon resolution in this case took place only after months of pre-charge negotiations, which themselves began months after an already overt investigation that included the execution of a search warrant at the defendant's home. And while the defendant claims his acceptance of responsibility, his sentencing memorandum also repeatedly seeks to point the finger and deflect blame for his own conduct to other people, entities, and events.

In addition, while the defendant has consented to an order of forfeiture, the Government is unaware of the defendant having made any effort to date to pay any amount of restitution or forfeiture, despite the financial means to have made at least some repayment. Indeed, the PSR raises questions about the extent to which the defendant fully and accurately completed his financial affidavit, noting that, for example, his 2024 Tax Return included more than $35,000 in capital gains, but the defendant listed no brokerage accounts in his financial affidavit. (PSR ¶ 135).[3] In addition, the defendant purchased property in 2021 for $2 million, filed a quit claim transfer of ownership to his trust in 2022, and the trust then sold the property in 2024 for $4 million, but it is unclear where the proceeds from the sale were deposited. (PSR ¶¶ 137, 142).

The defendant also argues that his health challenges, including an amputated toe, Hepatitis C, diabetes, hypertension, high cholesterol, and neuropathy, along with the fact that he is 70 years old, support a sentence of two years' imprisonment. While the Government is sympathetic to his health conditions, all can be addressed by the Bureau of Prisons and most are quite common. The defendant chose to engage in this criminal conduct as an older man. Given the serious criminal conduct and his leading role in that conduct, the Government respectfully submits that his age is not a sufficient reason for imposing the sentence Miller seeks. As discussed above, the Government respectfully submits that the mitigating factors in this case such as the defendant's age and health conditions have been adequately accounted for through the imposition of the statutory cap in this case, as well as the Government's recommendation of a sentence significantly below that cap.

Balancing all of the relevant Section 3553(a) factors together, including the offense conduct, the defendant's role, his personal characteristics, and the need to promote respect for the law, provide adequate deterrence, and provide just punishment, the Government respectfully submits that the Guidelines sentence of 84 months' imprisonment would be just.

---

[3] Similarly, the defendant's tax returns for 2022 through 2024 reported between $23,838 and $68,111 in ordinary dividend amounts, but the sources of these dividends are unknown. (PSR ¶ 140).

**V.  Conclusion**

For the reasons set forth above, the Government respectfully submits that a sentence of 84 months' imprisonment would be sufficient but not greater than necessary to comply with the purposes of sentencing.

Respectfully submitted,

JAY CLAYTON
United States Attorney


by: _____/s/_____
    Courtney L. Heavey/Matthew R. Shahabian
    Assistant United States Attorneys
    (212) 637-2413/-1046